**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DENISE COLLIERS,** | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **GARY GENSLER,** *in his official capacity* | : | |
| *as Chairman, U.S. Securities & Exchange* | : | |
| *Commission,* | : | |
| *Defendant* | : | **No. 21-3863** |

## MEMORANDUM

PRATTER, J.                                                    OCTOBER _26_, 2023

Like in life, the beginning of any lawsuit presents a plaintiff with boundless options for which claims to make and how to present them. But also like in life, as time goes on, those opportunities narrow.

Denise Colliers brought six claims against Gary Gensler, Chairman of the Securities and Exchange Commission ("SEC"), all stemming (1) from alleged age and race discrimination she believes she experienced a decade ago when she, as the only Black, older candidate, was denied a second-round interview after she applied for a supervisory position and (2) from retaliatory actions in the subsequent years. The SEC meanwhile argues that no such discrimination or retaliation occurred and filed a motion for summary judgment on all counts.

The Court finds that there is a genuine issue of material fact pertaining to Ms. Colliers's race and age discrimination failure to promote claims. However, the Court grants the defense summary judgment on Ms. Colliers's retaliation, Privacy Act, and alleged constitutional right to informational privacy claims.

1

BACKGROUND

## I.   The Hiring Process

On April 12, 2013, the SEC announced a job opening for the position of Assistant Director[1] of the Philadelphia Regional Office to fill two vacancies created by the departures of two Assistant Directors. The two departing Assistant Directors had, among other responsibilities, led the Market Abuse Unit and the Municipal Securities and Public Pensions Unit. Ms. Denise Colliers, an attorney with the SEC Enforcement Division's latter unit,[2] applied for this position.

As part of the selection process, the selecting official, Daniel Hawke, asked another SEC employee, Elaine Greenberg, who had previously supervised the assistant directors who had held the now-vacant positions, to choose a three-member panel to conduct the first round of interviews. Ms. Greenberg served in a supervisory position two steps above Ms. Colliers, and the two women previously had a negative interaction when Ms. Colliers refused to follow an order that she felt was unlawful.

Ms. Greenberg selected three Caucasian men for the hiring panel: Kingdon Kase, Frank Thomas, and Brendan McGlynn. Ms. Colliers, along with 13 other candidates, met individually with the hiring panel for first-round interviews over the course of three days. The members of the panel assessed the candidates and together selected seven candidates to advance to the next round. Ms. Colliers was not among them. According to the SEC, the deposition testimony of the members of the hiring panel and their contemporaneous notes suggest the panel did not advance Ms. Colliers because of her answers to specific interview questions, which the interviewers described as curt, unenthusiastic, and overall less effective than the seven candidates who advanced. The panel sent

---

[1]   The job posting was for a "Supervisory General Attorney," but all parties agree that the position was to replace the two Assistant Directors in the Philadelphia Regional Office.
[2]   In approximately 2016, the unit was renamed the Public Finance Abuse Unit.  Ms. Colliers today works in the Public Finance Abuse Unit.

its recommendations to Ms. Greenberg, who made no changes before sending the list of seven to Mr. Hawke.

That was the end of the road for Ms. Colliers, but the selection process continued. Mr. Hawke conducted interviews with the seven remaining candidates. In addition, sometime after the first-round interviews, Mr. Hawke made a phone call to Steven Buchholz, a younger White male candidate who, like Ms. Colliers, had not been advanced to the second round of interviews. The parties dispute the nature of this call, but according to the SEC, Mr. Hawke called Mr. Buchholz— who was the only candidate not from the Philadelphia office—to let him know personally that he was not being advanced and to encourage him to apply for other positions. Ms. Colliers did not receive such a call, nor did any other candidate.

On September 16th, Ms. Colliers learned that she was not moving forward in the application process. Ms. Colliers spoke with Mr. Hawke, who told her that the hiring panel had not advanced her because of her interview performance. On September 18th, Mr. Hawke announced via e-mail that two younger, White candidates had been selected for the open positions: Scott Thompson and Kelly Gibson. On September 19th, Ms. Colliers commenced the process of filing an Equal Employment Opportunity ("EEO") complaint asserting age, race, and gender discrimination.

## II.    The Alleged Retaliation

When Ms. Colliers spoke with Mr. Hawke on September 16th after she learned that she was not moving forward in the interview process, Mr. Hawke agreed to ask the members of the hiring panel for more information about why Ms. Colliers's candidacy was not advanced. When he came to Ms. Colliers on September 19th or 20th[3] to give her an update, he learned that she had

---

[3]    The parties dispute whether the conversation occurred on September 19th or 20th; however, the exact date of the conversation is not material for purposes of summary judgment.

filed an EEO complaint. He expressed his disappointment and told Ms. Colliers that she should have waited for him to give her the information from the hiring panel and that she should not have filed an EEO complaint based off her disappointment at not being selected. He then allegedly said that he would tell the EEO office that Ms. Colliers's complaint was meritless.

According to Ms. Colliers, Mr. Hawke stopped talking to her and avoided her presence from September 2013 until his retirement in August 2015. Ms. Colliers also alleges that Mr. Hawke's successor, Sharon Binger, likewise avoided interactions with Ms. Colliers. Ms. Colliers also lists other SEC employees whom she claims have also stopped interacting with her in the office, including Ms. Gibson, now the director of the Philadelphia office, Mr. McGlynn, and Mr. Thomas.

### III.    The Voluntary Separation Incentive Program

Approximately seven years later, in 2020, the SEC created a program to incentivize employees to resign, retire, or transfer to another agency. This specific Voluntary Separation Incentive Program offered SEC employees separation packages of $50,000 to leave their jobs. All SEC employees received this offer, regardless of age; however, an earlier proposal stated that one goal of the program was to "create additional ability for the SEC to hire employees of fresh expertise."

The SEC included information about the separation package program in an agency-wide email newsletter, *SEC Today*, which is how it reached Ms. Colliers. At the time, Ms. Colliers was very close to reaching 20 years of federal service, which would have entitled her to retirement with full benefits. According to Ms. Colliers, the separation package program was enacted with discriminatory purpose and the SEC's communications with her about that program was

4

specifically intended to retaliate against Ms. Colliers personally for her EEO complaint by pressuring her to resign before her benefits vested.

## IV.    The Upgrade Background Investigation

In 2018 and 2019,[4] the Office of Personnel Management conducted an audit and discovered that roughly 1,600 SEC employees had undergone background checks at a level too low for their positions. To remedy this, the SEC's personnel division emailed hundreds of employees to request personal information so it could conduct an upgraded background check. Ms. Colliers was one of the employees who received this contact.

Ms. Colliers believes that the SEC's authority to collect information for a background check is limited only to employees who have served less than a year, meaning the SEC could not legally ask her to comply with an upgraded background check. She asserts that the SEC's request for information was made in retaliation for her EEO complaint and that it also constitutes a violation of the Privacy Act and a purported constitutional right to informational privacy. To date, Ms. Colliers has not completed this upgraded background check.

### LEGAL STANDARD

To succeed on a motion for summary judgment, the moving party must establish "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it might affect the outcome of the suit under the governing law," *S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 256 (3d Cir. 2013) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)), and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict

---

[4]    Ms. Colliers disputes the year of the audit and argues that there was apparently an Office of Personnel Management audit in early 2018 or late 2017. The difference in year is not material for purposes of summary judgment.

for the nonmoving party." *Thomas v. Community College of Philadelphia*, 553 F. Supp. 2d 511, 514 (E.D. Pa 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant does so, the burden shifts to the nonmoving party to point to specific evidence in the record to show that there is a genuine issue for trial. *Id.* at 324. In other words, "summary judgment is essentially 'put up or shut up' time for the non-moving party," who must "rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (citing *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109-10 (3d Cir. 1985)).

DISCUSSION

### I.     Failure to Promote Age and Race Discrimination Claims

A claim of employment discrimination is "analyzed under the *McDonnell Douglas* burden-shifting framework." *Dudhi v. Temple Health Oaks Lung Center*, 834 F. App'x 727, 728 (3d Cir. 2020) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under that framework, the plaintiff must first present evidence "sufficient to support a *prima facie* case of discrimination." *Id.* If the plaintiff makes a *prima facie* case, the burden shifts to the employer who must then "identify a legitimate, nondiscriminatory reason for its adverse employment decision." *Id.* at 729. If the employer then can proffer such a nondiscriminatory reason, the burden shifts back to the plaintiff who must show that the employer's nondiscriminatory reason was pretextual. *Id.*

Here, solely for the purposes of summary judgment, the SEC assumes that Ms. Colliers can make out a prima facie case of discrimination under the *McDonnell Douglas* framework, thus meeting the first factor. The SEC has put forward evidence of a legitimate, non-discriminatory reason for not advancing Ms. Colliers, namely, her interview performance. The SEC argues that

6

the hiring panel found her performance "significantly inferior" to the seven candidates who advanced and bases this on three reasons: (1) Ms. Colliers's response when asked about her weaknesses, (2) her response when asked about her writing and oral communication skills, and (3) her appearance of generally being less enthusiastic about the opportunity.

In response, Ms. Colliers argues that the hiring panel's use of subjective criteria such as communication skills, instead of more objective criteria like number of years of experience, is evidence of pretext. But although it is true that subjective evaluations, possibly devoid of any reasoning or explanation, can serve to mask pretext, *see Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 321 (3d Cir. 2000); *Alvarado v. Texas Rangers*, 492 F.3d 605, 617 (5th Cir. 2007), the use of subjective criteria does not necessarily indicate pretext where, as here, the employer provides contemporaneous notes and comments from the selecting officials detailing their impressions of the strengths and weaknesses of the candidates. *See Bulifant v. Del. River and Bay Auth.*, 698 F. App'x 660, 663 n.9 (3d Cir. 2017). In any event, it is not enough for Ms. Colliers to claim that she was scored subjectively; she must also produce some evidence that her "particular ratings were pretext for discriminatory bias." *See Fowler v. AT & T, Inc.*, 19 F. 4th 292, 302 (3d Cir. 2021).

A plaintiff meets her burden to show pretext and defeat a motion for summary judgment by "providing evidence that would allow a fact finder reasonably to '(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of the employer's action.'" *Byrd v. Phila. Gas Works*, No. 19-5305, 2021 WL 5867881, at *8 (E.D. Pa. Dec. 10, 2021) (citing *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 799-800 (3d Cir. 2003)). In other words, the plaintiff may defeat summary judgment "by *either* (i) discrediting the proffered reasons, either circumstantially or

directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). However, the evidence "must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Id.*

Here, Ms. Colliers first argues that she was the most qualified person for the position; "however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken" when the dispute concerns discriminatory animus, "not whether the employer is wise, shrewd, prudent or competent." *Fuentes*, 32 F.3d at 765. Thus, more is required than Ms. Colliers's own proclamation that she was the most qualified person for the job.

As noted above, the SEC argues that Ms. Colliers did not proceed to a second interview because of the assessment of her interview performance. However, Ms. Colliers has presented evidence that a member of the hiring panel, Mr. Kase, told Mr. Hawke that another candidate, Ms. Gibson, despite being a good candidate, was "nervous," "did not come across well" in the interview, and answered that her weakness was "poor analytical skills." Hawke Dep. 84:5-85:22. Mr. Kase ranked Ms. Gibson fifth during the first round of interviews, while Mr. Thomas ranked her fourth.

Unlike Ms. Colliers, Ms. Gibson not only moved on to the second round of interviews but was also ultimately chosen for the open position. Based on this evidence, it appears that neither Ms. Colliers nor Ms. Gibson performed particularly well in the first interview. But Ms. Gibson, a younger, White candidate, advanced in the selection process, and Ms. Colliers, an older, Black candidate, did not. This is the type of circumstantial evidence that may discredit the SEC's

proffered reason for Ms. Colliers not advancing, her interview performance, and thus permit Ms. Colliers's claim to at least survive summary judgment on these counts. *See Fuentes*, 32 F.3d at 764. Thus, the jury will decide whether Ms. Colliers faced age and/or race discrimination when interviewing for a promotion at the SEC.[5]

## II.    Retaliation Claims

The *McDonnell Douglas* framework guides the Court on the retaliation claim as well. Ms. Colliers must show that "(1) [she] engaged in an activity protected by Title VII; (2) the [SEC] took an adverse employment action either after or contemporaneous with [Ms. Colliers's] protected activity; and (3) a causal connection between [Ms. Colliers's] protected activity and the [SEC]'s adverse action." *Boykins v. SEPTA*, 722 F. App'x 148, 156 (3d Cir. 2018).

An adverse employment action "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006). "Termination, failure to promote, and failure to hire all constitute adverse employment actions[,]" as well as "actions that reduce opportunities for promotion or professional growth. . . ." *Barnees v. Nationwide Mut. Ins. Co.*, 598 F. App'x 86, 90 (3d Cir. 2015).

An adverse action does not include "those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). But it does prohibit "employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." *Id.* (internal quotations omitted). *Burlington Northern* thus requires "that a plaintiff claiming retaliation under

---

[5]    Ms. Colliers argues a plethora of other reasons for discrimination in the hiring process. The Court finds the discrepancies of Ms. Colliers's and Ms. Gibson's interview performances sufficient to cause the Court pause in evaluating credibility and efficacy of the claims, though for now Ms. Colliers can make these additional arguments to the jury if she so chooses.

Title VII must show that a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Parker v. Univ. of Pennsylvania*, 239 F. App'x 773, 775-76 (3d Cir. 2007) (quoting *Burlington Northern*, 548 U.S. at 54).

Here, Ms. Colliers alleges four instances of retaliation after she told Mr. Hawke that she would file a complaint with the EEOC: (1) Mr. Hawke's statement that he would tell EEO personnel her claim was without merit immediately after Mr. Colliers told him that she filed the complaint, (2) the shunning she experienced from her co-workers, (3) the SEC's encouragement that she accept the voluntary separation incentive program, and (4) the SEC's attempt to have her upgrade her background investigation. The Court must analyze the overall work environment in which Ms. Colliers worked after the alleged retaliation and not each of these instances separately. *Hare v. Potter*, 220 F. App'x 120, 132 (3d Cir. 2007). Because the latter two instances occurred seven years later than the first two, the Court first analyzes these separately and then together.

### A.  2013 Actions

Ms. Colliers told Mr. Hawke that she planned to file an EEO complaint because she was not selected to move on. Ms. Colliers had also previously filed an EEO complaint in 2005. In the instant matter, Mr. Hawke apparently told Ms. Colliers that she should not start a lawsuit every time she is disappointed. Mr. Hawke then allegedly told Ms. Colliers that he would reach out to the EEO office and tell them that her claim was utterly without merit.

Ms. Colliers next asserts that her co-workers shunned her in the office after her discussion with Mr. Hawke. She argues that various co-workers avoided acknowledging her presence, were uncomfortable sitting across the table from her, and that Ms. Gibson avoided eye contact with her and did not speak with her for a full year after Ms. Gibson was selected for the role.

Ms. Colliers brings a retaliatory claim based on a hostile work environment, which "is [a work environment] that is 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Clarkson v. SEPTA*, 700 F. App'x 111, 115-16 (3d Cir. 2017) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).

Standing alone, Mr. Hawke's alleged one-off comment does not meet the standard for making out a claim. Ms. Colliers has not presented any evidence in the factual record that Mr. Hawke took action materially adverse to Ms. Colliers such that she would be discouraged from bringing a lawsuit in the future. In fact, she has presented no evidence that Mr. Hawke tried to exert any influence on the EEOC or anyone pertaining to Ms. Colliers's complaint.

In *Remp v. Alcon Lab'ys, Inc.*, the Court of Appeals found at summary judgment that the employer's action did not constitute retaliation at summary judgment when the employer allegedly "retaliated against [Plaintiff] after she reported alleged discrimination by warning her that someone could file an anti-defamation suit against her, and by threatening to report Remp to the department responsible for internal discipline" because the employee acknowledged that the employer did not discipline her and no one filed suit. 701 F. App'x 103, 108 (3d Cir. 2017). An analogous situation exists here where Mr. Hawke allegedly threatened Ms. Colliers but then never acted improperly to influence the EEOC. In other words, there is no evidence of *actual* retaliation that was materially adverse to Ms. Colliers.

Moving to other aspects of Ms. Colliers's claims, each of the interactions between Ms. Colliers and her other co-workers is akin to the "petty annoyances" that do not constitute an adverse employment action. *See Burlington North*, 548 U.S. at 68. Ms. Colliers has not proffered any evidence that any of these interactions affected her work performance or her ability to grow

11

professionally within the SEC. Ms. Colliers has not presented evidence that her co-workers in the office even knew about her complaint. Rather, she testified that "it was a small office. People gossip." Colliers Dep. 45:8-11 (emphasis added). But "the sporadic threats of termination, *workplace gossip*, and disparaging comments, do not rise to the level of a materially adverse employment action." *Clarkson*, 700 F. App'x at 115 (emphasis added).

When asked if she had any evidence that anyone other than four individuals and her union, none of whom were involved in the conduct that grieves her, knew about the EEO complaint, Ms. Colliers answered "No." App. 1991, Colliers Dep. 45:5-:15. Moreover, Ms. Colliers "cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's conduct at the time they acted." *Daniels v. School Dist. of Philadelphia*, 776 F.3d 181, 196 (3d Cir. 2015). And "[s]peculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Boykins*, 722 F. App'x at 158 (quotation omitted). Thus, Ms. Colliers's co-workers shunning her, even when coupled with Mr. Hawke's remark, does not present sufficient evidence to amount to a genuine issue of material fact on her retaliation claim.

## B.  2020 Actions

Ms. Colliers next claims that "[t]he retaliation became more real on April 7, 2020" when the SEC demanded that she submit to an upgraded background investigation. The SEC argues that the requested background check was sent to hundreds of SEC employees and that no reasonable factfinder could find this conduct to be materially adverse, nor could there be a causal connection between the demand for information and a reasonable concern of retaliation.

The Court agrees. The SEC put forward evidence that its personnel operation identified 461 or more SEC employees, including Ms. Colliers, who initially received a Tier 1 background investigation who should have instead received a higher Tier 4 background investigation. Ms.

Colliers does not dispute the fact that 461 individuals were identified or that each of them was contacted to complete the background check. Instead, Ms. Colliers asserts that she should not have been subject to the background investigation.

Once again, though, Ms. Colliers has not presented any evidence or facts that call into question the requested upgraded background check being sent not only to her but also to approximately 460 others. A legitimate request sent to over 450 individuals could not have created so hostile a work environment "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" for Ms. Colliers. *See Clarkson*, 700 F. App'x at 115-16.

Furthermore, there is no causal connection between the requested upgraded background investigation and Ms. Colliers's EEOC complaint from approximately seven years earlier. There is no evidence in the record that the SEC personnel office even knew about Ms. Colliers's complaint. Ms. Colliers argues that "[w]hether [the SEC] knew at the time of including Ms. Colliers in the upgrade program at the start is irrelevant." But that is not the law in the Third Circuit, which requires "that the individuals responsible for the adverse action *knew* of the plaintiff's conduct at the time they acted." *Daniels*, 776 F.3d at 196 (emphasis added). Thus, the upgraded background investigation demand neither resulted in material adverse conditions for Ms. Colliers nor was it causally connected to her filing an EEOC complaint.

Similarly in 2020, the SEC sent out a Voluntary Separation Incentive Program to all employees, which Ms. Colliers claims was another instance of retaliation against her. But Ms. Colliers has not shown any causal connection between the program announcement and her discrimination claim accruing approximately seven years earlier. Indeed, Ms. Colliers testified during her deposition that she only received notification of the program through an *agency-wide*

article, meaning that the offer for the payment was not focused on Ms. Colliers. App. 2062, Colliers Dep. 77:6-10 (emphasis added). Ms. Colliers again presents no evidence in the factual record connecting this agency-wide program notice with her specific actions dating back seven years earlier. She has also not identified any evidence that whoever distributed the agency-wide newsletter knew about her 2013 EEOC complaint. Thus, Ms. Colliers fails to demonstrate the connection between the two.

Because she has also presented no evidence connecting either of these actions with those in 2013, Ms. Colliers has not demonstrated that a genuine issue of material fact exists when evaluating together or separately all the alleged instances of retaliation. Thus, the Court grants the SEC's motion for summary judgment on the retaliatory hostile work environment claims.

### III.     Privacy Act Claim

Ms. Colliers asserts her next claim under 5 U.S.C. § 552a(g)(1)(D) of the Privacy Act, which provides that an individual may pursue a civil remedy "[w]henever any agency . . . fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual." The reference to "adverse effect" "acts as a term of art identifying a potential plaintiff who satisfies the injury-in-fact and causation requirements of Article III standing[.]" *Campeau v. Social Sec. Admin.*, 575 F. App'x 35, 38 (3d Cir. 2014) (per curiam) (quoting *Doe v. Chao*, 540 U.S. 614, 624 (2004)).

To prove a violation of the Privacy Act, a plaintiff "must advance evidence to support a jury's finding of four necessary elements: (1) the information is covered by the Act as a 'record' contained in a 'system of records'; (2) the agency 'disclose[d]' the information; (3) the disclosure had an 'adverse effect' on the plaintiff (an element which separates itself into two components: (a) an adverse effect standing requirement and (b) a causal nexus between the disclosure and the

adverse effect); and (4) the disclosure was 'willful or intentional.'" *Quinn v. Stone*, 978 F.2d 126, 131 (3d Cir. 1992).

Here, Ms. Colliers argues that the SEC violated the Privacy Act when it (1) requested in 2020 that she provide certain information to conduct a background investigation for her position and (2) sent a particular form to her that did not contain a Privacy Act statement. She claims that the request violated the Privacy Act's mandate that an agency "maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President." 5 U.S.C. § 552(e)(1).

Ms. Colliers claims that the SEC could only initiate the background upgrade within 14 days of her position being moved from the "Moderate Risk" category to "High Risk." However, the SEC determined through an audit that approximately 1,600 employees had background investigations set too low for their positions, including Ms. Colliers. The SEC argues that the SEC and all other federal agencies "have been required by law, since 1953, to ensure that their employees have completed background investigations that are commensurate with their position risk levels." Because of the audit, the SEC requested that Ms. Colliers, and many others, complete the background upgrade so that it had the "relevant and necessary" information to follow the law by ensuring that employees had the proper background investigation level.

Ms. Colliers received four standard forms from the SEC as attachments to an April 7, 2020 e-mail, and although Ms. Colliers asserts that only one, the Update Project Employee Data Form, did not have "the requisite Privacy Act Notice[,]" she does not dispute that the other three included the Privacy Act statement. In fact, she admitted in her deposition testimony that all of the forms "probably" included a Privacy Act statement. Colliers Dep. 217:24-218:8.

The inclusion of the Privacy Act statement undermines Ms. Colliers's claims. Federal regulations governing the Privacy Act statement hold that the "implicit" requirement of the relevant subsection "is the notion of informed consent since an individual should be provided with sufficient information about the request to make an informed decision on whether or not to respond." 40 Fed. Reg. at 28,961. The agency "need not explain *all* of its rules or regulations on one small form to meet the requirements of subsection (e)(3)." *Thompson v. Dep't of State*, 400 F. Supp. 2d 1, 17 (D.D.C. 2005).

Here, the SEC provided sufficient information for Ms. Colliers to make an informed decision. There is no genuine issue that the Update Project Employee Data Form, when sent with the other three documents, contained sufficient information by which Ms. Colliers, an experienced SEC attorney, could make an informed decision and provide informed consent to the agency's request for information. Because there is no genuine issue of material fact that Ms. Colliers had enough information to make an informed decision in undergoing the background investigation upgrade or potentially have her job terminated, no reasonable jury could find that the SEC violated the Privacy Act.

Ms. Colliers also argues that the SEC was not authorized to conduct a background check on her because, she argues, the SEC's authority is limited to conducting background investigations of applicants and appointees in their first year of duty. However, a 2015 regulation required federal agencies to conduct background investigations for all federal personnel according to the sensitivity level of the position. 5 C.F.R. § 1400; Bruce Interrog. ¶¶ 708, SEC App. 2230-31. And the results of the OPM audit showed that Ms. Colliers, along with many others, had not undergone the requisite background investigation consistent with the 2015 regulation. Thus, the SEC's request for the updated background investigation was one "relevant and necessary to accomplish a legal

purpose of the agency[,]" *Thompson*, 400 F. Supp. 2d at 17. In this case, the SEC's seeking the information was for the purpose of complying with 5 C.F.R. § 1400.

Additionally, Ms. Colliers cannot show that she suffered damages. She claims that she suffered damages when she "spent roughly $5000 on attorney's [sic] fees during the arguments about whether she had to comply with the SEC's demand" and took annual leave "to do the legal and factual research necessary to substantiate her position in the dispute." However, validating this claim would mean that damages result any time someone hires an attorney of his or her own volition to investigate a potential issue or any time a person takes off work to do something else. A "purely voluntary decision" does not meet the standing requirement for a Privacy Act claim because this type of "self-inflicted injur[y] [is] not fairly traceable to the Government's purported activities." *Campeau v. Social Sec. Admin.*, 575 F. App'x 35, 38 (3d Cir. 2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013)). Thus, as a matter of law, Ms. Colliers does not have standing sufficient for a Privacy Act claim.

Finally, if the foregoing was not a sufficient impediment to Ms. Colliers's invocation of the Privacy Act, Ms. Colliers has not shown that the SEC acted "willfully or intentionally" in violating the Privacy Act. The "intentional or willful" standard "has been construed as one that requires that the agency 'commit[] the act without grounds for believing it to be lawful, or by flagrantly disregarding others' rights under the Act.'" *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 551 (3d Cir. 1989). Ms. Colliers has presented no evidence that the SEC sent this background investigation upgrade to many employees while believing such an action was unlawful or while flagrantly disregarding the rights of Ms. Colliers and others who received the upgrade background investigation request. In other words, Ms. Colliers points to no part of the voluminous summary

judgment record in which she can demonstrate that the SEC acted willfully or intentionally. Thus, the Court grants the SEC's motion for summary judgment on the Privacy Act claim.

## IV.    Constitutional Right to Informational Privacy Claim

Finally, Ms. Colliers claims that the SEC violated her constitutional right to informational privacy, which she claims exists under *Whalen v. Roe*. 420 U.S. 589, 604 (1977). The SEC argues that Title VII and the ADEA preempt her constitutional claim, and, in the alternative, that no such constitutional right exists or that it does not exist when an agency collects information to perform a standard background investigation.

Although there may be a growing importance to determine whether such a right to informational privacy exists in the wake of increasing data security breaches resulting in copious lawsuits,[6] the Court need not analyze that purported right here because Ms. Colliers's constitutional claim is preempted by her Title VII and ADEA claims. "Title VII is the 'exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination.'" *Francis v. Mineta*, 505 F.3d 266, 271 (3d Cir. 2007) (quoting *Brown v. GSA*, 425 U.S. 820, 829 (1976)). "Title VII thus sweeps within its reach all claims of employment discrimination whether they are based on religion or another enumerated form of discrimination that may impact a constitutionally protected right." *Id.*

Here, Ms. Colliers's constitutional claim traces back to the same SEC conduct requesting her personal information for the upgraded background check. Ms. Colliers argues that the two claims are independent because retaliatory motive is not part of the constitutional claim. But merely because the two causes of action may not have the same elements does not mean that the

---

[6]     *See, e.g., In re Wawa, Inc. Data Security Litig.*, No. 19-cv-6019 (E.D. Pa.); *In re Imagine360, LLC Data Breach Security Incident Litig.*, No. 23-cv-2603 (E.D. Pa.); *In re Home Depot Customer Data Sec. Breach Litig.*, MDL No. 2583 (N.D. Ga.).

claims themselves are independent of each other. Ms. Colliers admits herself "[y]es, the facts are mostly the same[.]" P.'s Mem. Opp'n Summ. J. 42. The SEC's request of Ms. Colliers to submit to the upgrade background investigation "may impact" her alleged constitutional right, but Title VII "sweeps within its reach" this very same claim because it is the basis, in part, for her retaliation claims. In other words, Ms. Colliers's constitutional claim is, in essence, another similar avenue through which she seeks relief based on the same facts underlying her retaliation claims. And because Title VII is the exclusive avenue through which she can seek recovery for the alleged harm suffered from the events underlying the same facts, her constitutional claim necessarily fails as a matter of law. Thus, the Court grants the SEC's motion for summary judgment on the alleged constitutional right to informational privacy claim.

## CONCLUSION

For the foregoing reasons, the Court denies the SEC's Motion for Summary Judgment on Counts I and II and grants the Motion on Counts III, IV, V, and VI.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE